1

2                  **E-Filed 12/13/05**

3

4

5

6

7

8 NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

9

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

**SAN JOSE DIVISION**

11

12

| | |
|---|---|
| CRISTINA PLATA, et al., | Case Number C 05-02746 JF |
| Plaintiffs, | ORDER[1] (1) DENYING MOTION TO STRIKE AND (2) GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS |
| v. | |
| LONG BEACH MORTGAGE COMPANY, et al., | [Docket No. 27, 28] |
| Defendants. | |

13

14

15

16

17

18

19 **I. BACKGROUND**

20       On July 5, 2005, Plaintiffs Cristina Plata ("Plata") and Luis Mapula ("Mapula") filed a

21 complaint against Defendants Long Beach Mortgage Company ("LBMC"), Vision Quest 21 Inc.

22 dba Century 21 Su Casa ("Vision Quest"), Mariposa Mortgage, Inc. ("Mariposa"), Washington

23 Mutual, Bic D. Pho ("Pho"), Felipe Antonio Neri ("Neri"), Antonio Sandoval ("Sandoval"),

24 Raphael Angel Berrios ("Berrios"), and Does 1 to 50.  Plaintiffs allege fourteen claims for relief:[2]

25 _____

26      [1] This disposition is not designated for publication and may not be cited.

27      [2] In their complaint, Plaintiffs specify the Plaintiff(s) asserting each claim and the

28 Defendant(s) against whom each claim is alleged.  For the purposes of the instant motions, which

1   (1) Violation of the Truth in Lending Act, 15. U.S.C. § 1601 *et seq*., and Federal Reserve

2   Regulation Z. 12 C.F.R. § 226 *et seq*., (2) Violation of the Real Estate and Settlement Procedures

3   Act, 12 U.S.C. § 2601 *et seq*. and Federal Reserve Regulation X, 24 C.F.R. § 3500 *et seq*., (3)

4   Predatory Lending, California Financial Code § 4970 *et seq*., (4) Violation of the Unfair

5   Competition Act, California Business and Processions Code § 17200 *et seq*., (5) Violation of the

6   False Advertising Act, California Business and Processions Code § 17500 *et seq*., (6)

7   Constructive Fraud, California Civil Code, § 1573, (7) Intentional Misrepresentation, California

8   Civil Code §§ 1709-1710, (8) Concealment, California Civil Code §§ 1709-1710, (9) Negligent

9   Misrepresentation, California Civil Code §§ 1709-1710, (10) Breach of Fiduciary Duty, (11)

10   Negligence, (12) Notary Malfeasance, (13)Violation of California Civil Code § 1632, and (14)

11   Rescission/Cancellation, California Civil Code § 1689 and "Court's Inherent Equitable

12   Authority."  Plaintiffs request damages and injunctive and declaratory relief.

13       Plaintiffs allege the following facts.  Plata and Mapula are of Mexican origin and, at all

14   relevant times, were married to each other.  Also at all relevant times, both Plaintiffs spoke

15   minimal English and could not read or write in English.  In April 2004, Plata attended a flea

16   market in San Jose, California, where Vision Quest had a marketing table.  An individual who

17   identified himself as a representative of Century 21 Su Casa, which Plaintiffs allege was a name

18   under which Vision Quest did business, approached Plata and offered to assist her with the

19   purchase of a home.  She explained that she was living in a converted single-room garage and

20   was not actively shopping for a home, but nevertheless gave her contact information to the

21   representative.  Neither Plata nor Mapula had ever purchased any real property.

22       Approximately one week after the introduction at the flea market, Humberto Madero

23   ("Madero") contacted Plaintiffs and invited them to Vision Quest's office for an evaluation of

24   their home-purchasing options.  Approximately one week later, Plaintiffs met Madero at the

25   Vision Quest office, where Madero introduced Plaintiffs to his supervisor, Neri.  Neri evaluated

26

27   relate to only five of the fourteen claims, it is not necessary to identify the parties relevant to each

28   claim.

Case No. C 05-02746 JF
ORDER (1) DENYING MOTION TO STRIKE AND (2) GRANTING IN PART AND DENYING IN PART MOTION
TO DISMISS
(JFLC1)

1   Mapula's credit history and informed him that he would be able to purchase a home with no

2   down payment.  Madero then drove Plaintiffs to several properties for sale, of which the

3   Plaintiffs liked a home located at 2834 Burdick Way in San Jose, California ("Burdick

4   property"), owned by Sandoval.  Madero told Plaintiffs that the monthly payment should be no

5   more than $2,800.  In a meeting at the end of April, 2004, Neri informed Plaintiffs that their

6   monthly payments would be approximately $2,700 and that Sandoval would give Plaintiffs

7   $8,000 which could be used toward the purchase of the property.  Mapula then signed a purchase

8   agreement.

9          In early May, 2004, Madero informed Plaintiffs for the first time that they would have to

10  pay to Neri all closing costs, represented to be $5,000, up front.  Plaintiffs assert that they would

11  not have purchased the property if they had known that they would need to pay the closing costs

12  up front, but that Mapula believed that he had entered into a binding agreement.  Plaintiffs

13  borrowed $5,000 to pay Neri.

14         Approximately one week later, while at the Vision Quest office, an employee of Vision

15  Quest asked Mapula, through a Spanish-language interpreter, how much he and Plata could

16  afford to pay in monthly mortgage payments.  Mapula responded that he understood that the

17  monthly payments would be approximately $2,700 and that they could not afford a monthly

18  payment greater than $3,000.  Later that month, Plata said to the interpreter that he and his wife

19  could not afford a monthly mortgage payment of $3,000.  The interpreter told Plata that he and

20  Mapula would be able to move into the Burdick property no later than June 14, 2005.  Soon

21  thereafter, Plata traveled to Mexico for several weeks.

22         In early June, Mapula tried unsuccessfully to reach Madero by telephone and,

23  subsequently, went to the Vision Quest office.  Neri then informed Mapula that the monthly

24  payments would be $3,200.  Mapula responded that he and his wife could not afford this

25  payment, to which Neri responded that they could refinance the property in 24 months so that the

26  monthly payment could be lowered.  Neri also told Mapula that he would receive several

27  thousand dollars in cash which would ease the burden of the monthly payments.  Neri further

28

3

1    advised Mapula that if he was unable to make payments, he should contact Neri, who would

2    refinance the home, but that Mapula could not fall behind on the payments for more than one

3    month.

4         In early July, 2004, at the request of Neri, Mapula met with Berrios and signed certain

5    documents.  Mapula noticed that one of the documents contained a figure between $3,500 and

6    $4,500.  Neri explained that the figure was incorrect, and would be corrected later to $3,200.  At

7    this meeting, Mapula informed Berrios that Plata was in Mexico and would not return until late

8    July, 2004.  Neri then handed the documents that were to be signed by Plata to Berrios, and

9    directed Berrios to make sure that the paperwork was completed.  Plaintiffs believe that these

10   documents included an inter-spousal conveyance of a community property interest from Plata to

11   Mapula.  This conveyance was recorded as document number 17882693 at the Santa Clara Count

12   Recorder's office on or about July 6, 2004.  Though Plata claims never to have met Berrios or

13   signed the conveyance, this document was notarized by Berrios as having been signed by Plata in

14   his presence on June 24, 2004.

15        Soon thereafter, Mapula was informed that escrow had closed and he took possession of

16   the Burdick property.  Two weeks after he took possession, Mapula again met with Neri.  Neri

17   informed Mapula that he would not receive the several thousand dollars which had been

18   discussed previously, but that Neri had either contributed or arranged to contribute $16,000

19   toward the purchase of the property.  Neri had Mapula sign a note for $16,000 payable to

20   Sandoval, though the street address listed on the note was the address of the Vision Quest office.

21   This was the first that Plaintiffs learned of a $16,000 note.

22        Plaintiffs have since learned that the loan application prepared by Neri contained many

23   false or misleading representations about Mapula's assets, income, and employment history,

24   significantly exaggerating his financial capacity.  They learned also that they had purchased the

25   property with two loans underwritten by LBMC, the total principal of which was $543,000.

26   Plaintiffs' combined monthly mortgage payment is more than $3,500.  Washington Mutual

27   subsequently acquired both of the LBMC loans.  Plaintiffs believe that all of the documents

28

4

1    related to their purchase of the Burdick property are written in English.

2          In connection with Plaintiffs' loans, Mariposa received over $7,030 in fees and costs and

3    a yield spread premium of $4,344 (which was not clearly disclosed as such to Plaintiffs).  In

4    addition, Mariposa charged Plaintiffs $75 for Mapula's credit report.  The final HUD-1 shows

5    that Vision Quest received $295 and Berrios received $250.

6          Two motions are presently before the Court.  First, Defendant LBMC moves to strike

7    nine passages of Plaintiffs' complaint, selected from Plaintiffs' first and fourth claims and the

8    prayer for relief.  Second, Defendants LBMC and Washington Mutual move to dismiss the

9    second and eleventh claims against LBMC and the thirteenth claim against both LBMC and

10   Washington Mutual, pursuant to Federal Rule of Civil Procedure 12(b)(6).

11

12                                    **II. DISCUSSION**

13   **1.  Motion to strike**

14          Defendant LBMC moves to strike nine selected passages of Plaintiffs' complaint.  The

15   Court may strike "from any pleading any insufficient defense or any redundant, immaterial,

16   impertinent, or scandalous matter."  Fed.R.Civ.P. 12(f).  Motions to strike generally will not be

17   granted unless it is clear that the matter to be stricken could not have any possible bearing on the

18   subject matter of the litigation.  *LeDuc v. Kentucky Central Life Insurance Co.*, 814 F.Supp. 820,

19   830 (N.D. Cal. 1992).  Allegations "supplying background or historical material or other matter

20   of an evidentiary nature will not be stricken unless unduly prejudicial to defendant."  *Id*.

21   Moreover, allegations that contribute to a full understanding of the complaint as a whole need not

22   be stricken.  *Id*.

23          The Court is disinclined to grant a motion to strike when, as in the instant case, the

24   motion is essentially a request to rule on the merits of specific allegations presented in the

25   complaint.  However, at the hearing on December 9, 2005, the parties agreed to the following

26   clarification of the complaint.  First, to the extent that the rescission claim could be read as

27   asserting a TILA claim, the complaint should not be so read.  Instead, it should be read as

28

                                              5

asserting a common law claim for rescission.  Second, with respect to the Unfair Competition

Act claim, Plaintiffs have admitted that they cannot meet the requirements to assert standing on

behalf of the general public.  Thus, the complaint should be read not to assert such a claim.

Accordingly, the Court DENIES the motion to strike, but orders that the complaint be read in the

aforementioned ways.


**2.  Motion to dismiss**

A complaint may be dismissed for failure to state a claim upon which relief can be

granted for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under

a cognizable legal theory.  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Robertson v. Dean*

*Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984).  For purposes of a motion to

dismiss, all allegations of material fact in the complaint are taken as true and construed in the

light most favorable to the nonmoving party.  *Clegg v. Cult Awareness Network*, 18 F.3d 752,

754 (9th Cir. 1994).  A complaint should not be dismissed "unless it appears beyond doubt the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  *Id.*

However, the Court "is not required to accept legal conclusions cast in the form of factual

allegations if those conclusions cannot reasonably be drawn from the facts alleged."  *Id.* at

754-55.  Motions to dismiss generally are viewed with disfavor under this liberal standard and

are granted rarely.  *See Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).


**A.  Second claim: Violation of the Real Estate and Settlement Procedures Act and Federal**
**Reserve Regulation X**

Plaintiff Mapula alleges the second claim, for violation of the Real Estate and Settlement

Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq*. and Federal Reserve Regulation X, 24

C.F.R. § 3500 *et seq*., against all Defendants except Washington Mutual.  Plaintiff Plata does not

allege this claim.

Defendant LBMC moves to dismiss Mapula's second claim on the ground that under

Case No. C 05-02746 JF
ORDER (1) DENYING MOTION TO STRIKE AND (2) GRANTING IN PART AND DENYING IN PART MOTION
TO DISMISS
(JFLC1)

1   RESPA and Regulation X, a lender that makes federally regulated mortgage loans has only two

2   obligations: (1) to provide a borrower a special information booklet, 12 U.S.C. § 2604(c) and 24

3   C.F.R. § 3500.6; and (2) to provide a borrower with "a good faith estimate of the amount or

4   range of charges" that the borrower will incur with the settlement, 12 U.S.C. § 2604(c) and 24

5   C.F.R. §§ 3500.7(a) and (b).  Mapula opposes the motion to dismiss this claim, correctly

6   explaining that RESPA and Regulation X are broader than this characterization of them by

7   LBMC.  Mapula's claim is not that LBMC violated 12 U.S.C. § 2604, but rather that it violated

8   12 U.S.C. § 2607.

9        Section 8(a) of RESPA, 12 U.S.C. § 2607(a), provides that "[n]o person shall give and no

10   person shall accept any fee, kickback, or thing of value pursuant to any agreement or

11   understanding, oral or otherwise, that business incident to or a part of a real estate settlement

12   service involving a federally related mortgage loan shall be referred to any person."  Section 8(b)

13   of RESPA, 12 U.S.C. § 2607(b), provides that "[n]o person shall give and no person shall accept

14   any portion, split, or percentage of any charge made or received for the rendering of a real estate

15   settlement service in connection with a transaction involving a federally related mortgage loan

16   other than for services actually performed."  Section 8 violations are further defined by 24 C.F.R.

17   § 3500.14, "Prohibition against kickbacks and unearned fees."

18        In 2001, the Department of Housing and Urban Development ("HUD") clarified its

19   interpretation of §§ 2607(a) and (b).  *Real Estate Settlement Procedures Act Statement of Policy*

20   *2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage*

21   *Brokers, and Guidance Concerning Unearned Fees Under section 8(b)*, 66 Fed. Reg. 53,052

22   (Oct. 18, 2001) [hereinafter "*Statement of Policy 2001-1*"].  As originally set out in HUD's 1999

23   Statement of Policy, HUD established a two-part test for determining the legality of certain

24   lender payments to mortgage brokers under RESPA:

        (1) Whether goods or facilities were actually furnished or the services were
25      actually performed for the compensation paid and;
        (2) whether the payments are reasonably related to the value of the goods or
26      facilities that were actually furnished or services that were actually performed.

27

28

Case No. C 05-02746 JF
ORDER (1) DENYING MOTION TO STRIKE AND (2) GRANTING IN PART AND DENYING IN PART MOTION
TO DISMISS
(JFLC1)

1    *Statement of Policy 2001-1*, 66 Fed. Reg. at 53,052.

2         Yield spread premiums can be useful for borrowers who prefer not to pay up front

3    premiums for loans, and would rather pay fees financed through higher interest rates on loans.

4    However, HUD has explained that "in some cases less scrupulous brokers and lenders take

5    advantage of the complexity of the settlement transaction and use yield spread premiums as a

6    way to enhance the profitability of mortgage transactions without offering the borrower lower up

7    front fees." *Id*. at 53,054.  In these circumstances, "yield spread premiums serve to increase the

8    borrower's interest rate and the broker's overall compensation, without lowering up front cash

9    requirements for the borrower," and thus the yield spread premiums may not comply with the

10   second part of HUD's two-part test. *Id*.

11        Plaintiffs allege that, in connection with their loans, Mariposa received a yield spread

12   premium of $4,344, which was not clearly disclosed as such to Plaintiffs.  Complaint ¶ 89.  In the

13   second claim, Mapula alleges that because Neri received $5,000 in cash up front from Plaintiffs,

14   Mariposa did not incur any up front costs that would justify a yield spread premium.  Complaint

15   ¶ 125.  Further, Mapula alleges that because of the document falsification and the absence of all

16   necessary disclosure and Spanish translation, the value of Mariposa's brokering services was $0.

17   *Id*. ¶ 128.  Thus, Mapula alleges that Mariposa's "acceptance of a yield premium spread, and

18   defendant LBMC's payment of that yield spread premium, was an unlawful kickback and/or

19   unearned fee under RESPA because it was not reasonably related to the performance of lawful

20   services." *Id*. ¶ 130.  Mapula contends that "Defendant LBMC should have known that

21   defendant MARIPOSA did not earn the yield spread premium because, *inter alia*, '... common

22   industry practice is that lenders follow underwriting standards that demand a review of

23   originations and therefore lenders typically know that brokers have performed the services

24   required ...'  If defendant LBMC had reviewed plaintiff MAPULA's loan origination, including

25   his loan application, LBMC would have learned of the obvious red flags it contained." *Id*. ¶ 131

26   (internal citation omitted).  In addition, Mapula's allegations include a reference to HUD's two-

27   part test: "HUD's 2001-1 Policy Statement explains that the second prong of its two part test to

28

8

1  determine the legality of yield spread premiums may not be satisfied when the loan broker does

2  not offer the borrower the option to pay a lower amount of total fees up front." *Id*. ¶ 126.

3      The Court concludes that plaintiff Mapula has sufficiently pled a violation of 12 U.S.C. §

4  2607 and 24 C.F.R. § 3500.14. Mapula alleges that, when considering the value of the brokerage

5  services and the total compensation given for these services, LBMC has paid a yield spread

6  premium that does not comply with the second part of HUD's two-part test. LBMC's only

7  response to Mapula's explanation of his second claim is that "a yield spread premium provides a

8  benefit to the borrower, not something grossly unnecessary." Reply 2. LBMC selectively quotes

9  from HUD's Statement of Policy, which notes that a "yield spread premium [] *can be* a

10  legitimate tool to assist the borrower." *Statement of Policy 2001-1*, 66 Fed. Reg. at 53,054

11  (emphasis added). LBMC ignores the portions of the Statement of Policy, noted above, which

12  explain that, under some circumstances, a yield spread premium may not comply with the second

13  part of HUD's two-part test. Accordingly, the Court will DENY LBMC's motion to dismiss

14  Mapula's second claim.

15

16  **B. Eleventh claim: Negligence**

17      Plaintiffs Plata and Mapula allege their eleventh claim, for negligence, against only five

18  of the named Defendants: Neri, Pho, Vision Quest, Mariposa, and LBMC. Plaintiffs allege that a

19  "reasonably prudent" lender would not have originated the loans at issue in the instant case.

20  Complaint ¶ 203. They allege that Defendants "acted negligently in failing to properly consider,

21  investigate, evaluate or audit plaintiff MAPULA's loan application and/or ability to repay loans"

22  and "failed to consider the usual underwriting factors for assessing creditworthiness when they

23  loaned to plaintiff MAPULA." *Id*. at ¶¶ 204 and 205. In addition, they allege that Defendants

24  "knew or should have known to utilize the best practices for underwriting and issuing loans when

25  considering the LBMC loans to plaintiff MAPULA but negligently failed to do so." *Id*. at ¶ 206.

26      Defendant LBMC moves to dismiss the claim for negligence on two grounds. First,

27  LBMC argues that it is not directly liable because it owed no common law duty to Plaintiffs.

28

Case No. C 05-02746 JF
ORDER (1) DENYING MOTION TO STRIKE AND (2) GRANTING IN PART AND DENYING IN PART MOTION
TO DISMISS
(JFLC1)

1    Second, LBMC argues that it is not secondarily liable for any duty owed to Plaintiffs by their

2    mortgage brokers because the mortgage brokers were not LBMC's agents.

3

4    *i. LBMC's direct liability*

5        California courts have held that, in general, there is no duty of care owed to a borrower by

6    a lender.  *See, e.g.*, *Nymark v. Heart Fed. Savings & Loan Assn.*, 283 Cal. Rptr. 53, 56 (Ct. App.

7    1991) ("[A]s a general rule, a financial institution owes no duty of care to a borrower when the

8    institution's involvement in the loan transaction does not exceed the scope of its conventional

9    role as a mere lender of money.").  "Liability to a borrower for negligence arises only when the

10   lender 'actively participates' in the financed enterprise 'beyond the domain of the usual money

11   lender.'" *Wagner v. Benson*, 161 Cal. Rptr. 516, 521 (Ct. App. 1980) (citing *Connor v. Great*

12   *Western Sav. & Loan Assn.*, 69 Cal.2d 850 (1968); *Bradler v. Craig*, 79 Cal. Rptr. 401 (Ct. App.

13   1969); *Kinner v. World Sav. & Loan Assn.*, 129 Cal. Rptr. 400 (Ct. App. 1976)).

14       Plaintiffs contend that *Nymark* and *Wagner* are not controlling.  In *Nymark*, the court held

15   that the lender did not owe duty of care to the borrower when it conducted a property appraisal in

16   the context of approving a loan.  *Nymark*, 283 Cal. Rptr. 53.  In *Wagner*, the court held that the

17   lender owed no duty to the borrower with respect to the financial success of the investment made

18   by the borrower with the borrowed funds.  *Wagner*, 161 Cal. Rptr. at 521.  Plaintiffs argue that,

19   in making their analyses, the *Nymark* and *Wagner* courts should not have relied upon *Connor v.*

20   *Great Western Savings and Loan Association  Connor*, 69 Cal.2d 850.  However, this Court is

21   not in a position to question the analysis that led to the *Nymark* and *Wagner* courts' conclusions.

22       Plaintiffs also argue that the holdings of *Nymark* and *Wagner* are restricted to the facts of

23   those cases.  They note in particular that *Wagner* applied to a commercial loan, whereas the loan

24   at issue in the instant case was residential.  They argue that "the special protection that

25   lawmakers accord to residential home loans in consumer protection laws" – citing TILA,

26   RESPA, HOEPA, California Civil Code § 1632 and California Financial Code § 4970 *et seq*. –

27   support the conclusion that a lender of a residential loan owes a duty of care to a borrower even if

28

Case No. C 05-02746 JF
ORDER (1) DENYING MOTION TO STRIKE AND (2) GRANTING IN PART AND DENYING IN PART MOTION
TO DISMISS
(JFLC1)

1  a commercial lender does not.  However, Plaintiffs do not cite any case authority for this

2  proposition.

3         In their opposition, Plaintiffs assert an additional theory of direct liability for negligence,

4  contending that California Financial Code § 4973 creates a duty for a lender to evaluate a

5  borrower's ability to repay a loan covered by that statute.  California Financial Code § 4973(f)(1)

6  establishes specific obligations that a lender owes to a borrower:

7         A person who originates covered loans shall not make or arrange a covered loan
          unless at the time the loan is consummated, the person reasonably believes the
8         consumer, or consumers, when considered collectively in the case of multiple
          consumers, will be able to make the scheduled payments to repay the obligation
9         based upon a consideration of their current and expected income, current
          obligations, employment status, and other financial resources, other than the
10        consumer's equity in the dwelling that secures repayment of the loan.

11 However, this section does not create a general duty by a lender to a borrower.

12        Thus, Plaintiffs have not successfully alleged that LBMC owed them a duty that would

13 establish direct liability.  Accordingly, the Court will GRANT LBMC's motion to dismiss

14 Plaintiffs' eleventh claim, for negligence, against LBMC, but only to the extent that it is an

15 allegation of direct liability.

16

17 *ii.  LBMC's duty as derived from an agency relationship with the mortgage brokers*

18        Plaintiffs make a general boilerplate allegation of agency among the defendants.

19 Complaint ¶ 32.  In addition, Plaintiffs allege that LBMC paid a yield spread premium to the

20 mortgage broker.  *Id*. at ¶ 130.  Plaintiffs contend that these allegations are sufficient to plead that

21 the mortgage broker was an agent of LBMC.

22        LBMC argues that Plaintiffs have not sufficiently pled an agency relationship between it

23 and the broker.  LBMC contends that a mortgage broker is always the agent of the borrower, not

24 the agent of the lender.  It cites *Wyatt v. Union Mortgage Co.* for the proposition that a

25 "mortgage loan broker is *customarily* retained by a borrower to act as the Borrower's agent in

26 negotiating an acceptable loan."  *Wyatt*, 24 Cal.3d 773, 782 (1979) (emphasis added).  Plaintiffs

27 correctly point out that this describes only the customary relationship between a borrower and a

28

11

mortgage broker, and does not establish a bright line rule that a mortgage broker may never be the agent of a lender.  In addition, as Plaintiffs' counsel noted at the hearing on December 9, 2005, allegations in the complaint support the inference that the brokers were not working as agents of the Plaintiffs.

Under the liberal rules of pleading, Plaintiffs' allegations of agency are sufficient to survive a motion to dismiss.  Accordingly, the Court will DENY LBMC's motion to dismiss Plaintiffs' eleventh claim, for negligence, but only to the extent that it is an allegation of secondary liability.

## C. Thirteenth Claim: Violation of California Civil Code § 1632

Plaintiffs allege their thirteenth claim, for violation of California Civil Code § 1632, against only LBMC and Washington Mutual.  Plaintiffs allege that "Defendant LBMC failed to provide any loan documentation in the Spanish language despite the fact that the LBMC loans were negotiated in Spanish."  Complaint ¶ 217.  They allege also that, pursuant to § 1632(k), Defendant Washington Mutual "must allow defendant LBMC to repurchase the loans secured by the Burdick property and defendant LBMC must repurchase and rescind such loans."  *Id.* ¶ 218.

Parties agree that § 1632 applies to the contracts at issue in the instant case.  Section 1632(b) requires that:

> Any person engaged in a trade or business who negotiates primarily in Spanish, Chinese, Tagalog, Vietnamese, or Korean, orally or in writing, in the course of entering into any of the following, shall deliver to the other party to the contract or agreement and prior to the execution thereof, a translation of the contract or agreement in the language in which the contract or agreement was negotiated, which includes a translation of every term and condition in that contract or agreement.

Cal. Civ. Code § 1632(b).  Section 1632(k) requires that:

> Upon a failure to comply with the provisions of this section, the person aggrieved may rescind the contract or agreement in the manner provided by this chapter. When the contract for a consumer credit sale or consumer lease which has been sold and assigned to a financial institution is rescinded pursuant to this subdivision, the consumer shall make restitution to and have restitution made by the person with whom he or she made the contract, and shall give notice of rescission to the assignee. Notwithstanding that the contract was assigned without recourse, the assignment shall be deemed rescinded and the assignor shall

12

1    promptly repurchase the contract from the assignee.

2    Cal. Civ. Code § 1632(k).

3        Defendants LBMC and Washington Mutual move to dismiss Plaintiff Mapula's thirteenth

4    claim on the ground that Plaintiffs do not allege that LBMC or Washington Mutual conducted

5    business in Spanish or that they negotiated the contracts directly with Plaintiffs.  However,

6    Plaintiffs' theory of liability is *secondary* liability.  As explained above, Plaintiffs have met the

7    liberal pleading standards for agency liability.  To the extent that it may not be clear from the

8    complaint that the thirteenth claim is premised exclusively on secondary, rather than direct,

9    liability, the Court directs the parties to read the thirteenth claim as alleging only secondary

10   liability.  Accordingly, the Court will DENY LBMC's motion to dismiss Mapula's thirteenth

11   claim.

12

13                                      **IV. ORDER**

14       Good cause therefore appearing, IT IS HEREBY ORDERED that the motion to strike is

15   DENIED, and the parties are instructed to read the complaint in the aforementioned ways.  IT IS

16   FURTHER ORDERED that the motion to dismiss is GRANTED in part and DENIED in part.

17

18

19   DATED:  December 13, 2005

20

21                                    /s/ electronic signature authorized
22                                    JEREMY FOGEL
                                      United States District Judge
23

24

25

26

27

28

Case No. C 05-02746 JF
ORDER (1) DENYING MOTION TO STRIKE AND (2) GRANTING IN PART AND DENYING IN PART MOTION
TO DISMISS
(JFLC1)

1   This Order has been served upon the following persons:

2   Lisa A. Cole                        lcole@thelenreid.com, gmccombe@thelenreid.com

3   Moses Diaz                          mosesd@lawfoundation.org, moses@ucdavis-alumni.com

4   John L. Fallat                      jfallat@fallat.com, jbeard@fallat.com

5   Catherine M. Lee                    c.lee@mpglaw.com

6   James David Moore                   jdmoore@thelenreid.com, emancera@thelenreid.com

7   Shawn Robert Parr                   parrst@ix.netcom.com, lisa@parrlawgroup.com

8   Kimberly Nicole Pederson            kimp@lawfoundation.org

9   Keith L. Slenkovich                 kslenkovich@thelenreid.com, nbradshaw@thelenreid.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14